102 Cal.Rptr.2d 46 (2000)
85 Cal.App.4th 163
Christine DEGRASSI, Plaintiff and Appellant,
v.
Arthur COOK et al., Defendants and Respondents.
No. B136407.
Court of Appeal, Second District, Division Four.
November 30, 2000.
Review Granted February 28, 2001.
Robert L. Kern, Pomona, and Scott E. Wheeler, Covina, for Plaintiff and Appellant.
Leboeuf, Lamb, Greene & MacRae and Sharon C. Corda, Los Angeles; Bannan, Green, Frank & Terzian and Richard R. Terzian, Los Angeles, for Defendants and *47 Respondents Arthur Cook, Sue Bauer, Paul Butler, Albert Fishman, and Marshall Mouw.
Pollak, Vida & Fisher, Scott J. Vida, and Daniel P. Barer, Los Angeles, for Defendant and Respondent Burke, Williams and Sorensen.
CHARLES S. VOGEL, P.J.

STATEMENT OF THE CASE
Plaintiff and appellant Christine Degrassi, a former member of the Glendora City Council, sued defendants and respondents Sue Bauer, Albert Fishman, and Marshall Mouw, also members of the Glendora City Council, Arthur Cook, the City Manager, and Glendora Chief of Police, Paul Butler (the city defendants). In addition, she named the law firm of Burke, Williams and Sorensen as a defendant in its capacity as city attorney ("the law firm").
Degrassi's first amended complaint alleges in extensive detail that the city and law firm defendants excluded her from council meetings, deprived her of notice of meetings, denied her access to information, and generally discouraged, obstructed, and interfered with her participation as a city council person. A full explication of her pleading is simply unnecessary. In summary, Degrassi pleaded that the defendants' conduct was in "violation of her rights to Free Expression under Article I, Section 2 of the California Constitution, and a [second] related cause of action for civil conspiracy."[1] The first amended complaint also purports to allege a third cause of action against the law firm for punitive damages for intentionally and maliciously violating Degrassi's constitutional right of freedom of expression.[2]
The city defendants demurred on the grounds that article I, section 2 does not support a private cause of action for damages and, as a consequence, a cause of action for conspiracy to violate that constitutional provision does not lie.
On the same grounds as alleged in the first amended complaint, Degrassi filed a motion pursuant to Civil Code section 1714.10 to obtain leave to file a claim for civil conspiracy against the law firm defendant.
The trial court sustained the demurrer of the city defendants to both causes of action without leave to amend.[3] In addition, the trial court denied Degrassi's petition to file a conspiracy claim against the law firm defendant, eliminating any further consideration of the second cause of *48 action. On August 23, 1999, the trial court entered a judgment for the law firm defendant and, on September 22, 1999, entered judgment for the city defendants. Degrassi appeals from both judgments.

DISCUSSION

Constitutional Claim for Damages
On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, the appellate court will accept as true all facts alleged in the complaint as well as those that may be reasonably inferred. "The rules by which the sufficiency of a complaint is tested against a general demurrer are well settled. We not only treat the demurrer as admitting all material facts properly pleaded, but also `give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' [Citations.] [¶] If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (Quelimane Co. v. Stewart Title Guaranty Co. (1998) 19 Cal.4th 26, 38-39, 77 Cal.Rptr.2d 709, 960 P.2d 513.)
Degrassi candidly and explicitly states the theory of her claims and clearly articulates the issue presented: "The central focus of this appeal revolves around the question of whether or not an individual may maintain a cause of action [for damages] for violation of rights guaranteed pursuant to Article I, Section 2 of the California Constitution."
The primary, if not exclusive, authority on which Degrassi relies is Laguna Publishing Co. v. Golden Rain Foundation (1982) 131 Cal.App.3d 816, 182 Cal.Rptr. 813. There a divided court held that article I, section 2 supports a self-executing claim for damages. In other words, the court held the constitutional right to freedom of speech is an entirely self-executing provision and is not dependent on any enabling statutes. No other court has so held.
In Laguna Publishing, the plaintiff Laguna Publishing Company (LPC), a publisher of a throwaway newspaper, filed an action against Golden Rain Foundation of Laguna Hills (GRF). GRF owned the streets and sidewalks in Rossmoor Leisure World, a residential retirement community. GRF controlled access to Leisure World and excluded LPC from delivering unsolicited, free delivery of its newspaper to Leisure World residents. Another defendant was the publisher of a throwaway unsolicited newspaper. It had a longstanding relationship with GRF and had been permitted the exclusive right to deliver its unsolicited, free delivery throwaway publication to Leisure World residents.
LPC pursued its claims on various theories including unfair trade practices and violation of "its free speech and free press rights secured to it under either the federal or state Constitutions." (Laguna Publishing, supra, 131 Cal.App.3d at p. 821, 182 Cal.Rptr. 813.) Prior to the commencement of a jury trial, the court ruled that LPC would not be allowed to "put on evidence of the damages which it incurred as a result of the abridgement of its right of free speech, and [the court] assume[d] . . . that the plaintiff ha[d] suffered actual, demonstrable, compensatory damages arising solely from its exclusion from Leisure World and could have proved such damages had it been permitted to put on such evidence." (Id. at pp. 850-851, 182 Cal. Rptr. 813.)
The Court of Appeal reversed that ruling. It held that LPC should have been able to present evidence of damages accruing from a violation of its constitutionally protected free speech rights. It reasoned that Melvin v. Reid (1931) 112 Cal.App. 285, 297 P. 91 applied the constitutional inalienable rights arising from "old section 1, article I [of the California Constitution]" to support an action for invasion of privacy *49 to recover damages.[4] (Laguna Publishing, supra, 131 Cal.App.3d at p. 853, 182 Cal.Rptr. 813.) Using Melvin v. Reid as an analytical springboard, the Laguna Publishing majority held "[I]t is not illogical . . . to hold . . . that a direct right to sue for damages also accrued here by reason of plaintiffs exclusion from Leisure World, and that it accrued under article I, section 2 of the California Constitution." (Ibid.) In essence, the court extrapolated from an inalienable constitutional right of privacy claim (art. I, § 1) for damages the self-executing right to recover damages for a violation of the constitutional right of freedom of speech (art. I, § 2).
The majority explained that it could find no reason to exclude a violation of a constitutional right from the ambit of Civil Code sections 1708 and 3333.[5] On this premise, the majority concluded there was a statutory framework for the implementation of a right to recover damages for violation of section 1, article II. The court also interpreted the holdings in White v. Davis (1975) 13 Cal.3d 757, 120 Cal.Rptr. 94, 533 P.2d 222 and Porten v. University of San Francisco (1976) 64 Cal.App.3d 825, 134 Cal.Rptr. 839 as vindicating Melvin v. Reid, supra, 112 Cal.App. 285, 297 P.91. The majority simply reconciled a claim for damages for violation of free speech (art. I, § 2) on the ground that a common law right of privacy had been recognized as an inalienable right (art. I, § 1) in Melvin v. Reid and later legitimatized by decisional law applying the 1972 amendment of article I, section l.[6]
Justice Kaufman disagreed with the proposition that a self-executing constitutional provision automatically and necessarily gives rise to a cause of action for damages. "The fact that a constitutional provision is self-executing does not establish the remedies that are available for its enforcement. Injunctive or declaratory relief may be available to the exclusion of money damages. [11] Moreover, it is clear that the free press provision of the California Constitution is not self-executing, at least in the sense that its violation gives right to a direct cause of action for damages. Subdivision (a) of section 2 of article I provides: `Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.' (Italics added.) A constitutional *50 provision may be regarded as self-executing `if the nature and extent of the right conferred and the liability imposed are fixed by the Constitution itself, so that they can be determined by an examination and construction of its terms. . . .' [Citations.] Obviously, the language `a law may not restrain or abridge liberty of . . . press' falls a bit short of fixing the `extent of the right conferred' and, a fortiori, `the liability imposed.' Indeed, inasmuch as the prohibition is against abridgement of the right by `[a] law,' it is problematical whether the constitutional provision has any application to the conduct of nongovernmental entities." (Laguna Publishing, supra, 131 Cal.App.3d at p. 858, 182 Cal. Rptr. 813.)
Justice Kaufman also distinguished between the right of privacy cases relied on by the majority and a claim based on article I, section 2. He pointed out the "initiative constitutional amendment to section 1 of article I of the California Constitution, adding privacy to the enumerated inalienable rights, had a unique `legislative' history that indicated the provision was meant to protect the right of privacy against unlawful intrusions by either governmental or private entities and was intended to be enforceable without more." (Id, at pp. 858-859, 182 Cal.Rptr. 813, fn. omitted.) Justice Kaufman explained and distinguished the cases relied on by the majority: White v. Davis, supra, 13 Cal.3d 757, 120 Cal.Rptr. 94, 533 P.2d 222, and Porten v. University of San Francisco, supra, 64 Cal.App.3d 825, 134 Cal.Rptr. 839. He wrote: "The courts in both the White and Porten decisions relied entirely on that unique `legislative' history in determining that the provision establishing an inalienable right to privacy was selfexecuting and, apparently in Porten, that its violation gives rise to a direct cause of action for damages. Thus those decisions constitute no authority for a damage action based on article I, section 2, subdivision (a)." (Laguna Publishing, supra, 131 Cal. App.3d at p. 859, 182 Cal.Rptr. 813.)
Only Laguna Publishing, supra, and Fenton v. Groveland Community Services Dist. (1982) 135 Cal.App.3d 797, 185 Cal. Rptr. 758 have held any provision of the state Constitution to be self-executing. The Fenton court held that a violation of the plaintiffs right to vote as guaranteed by article II, section 2, is a self-executing constitutional right giving rise to the right to recover damages, relying only on Laguna Publishing as authority for its conclusion. As we shall explain, we do not agree with Laguna Publishing and, a fortiori, we do not find Fenton compelling. All other authorities that have considered the issue of whether a constitutional right is self-executing have generally applied the standard articulated by Justice Kaufman.
In Leger v. Stockton Unified School Dist. (1988) 202 Cal.App.3d 1448, 249 Cal. Rptr. 688, the plaintiff student filed an action to recover damages against the defendant school district for injuries sustained when he was battered on campus by a non-student. Among the theories of relief he alleged was the inalienable right to attend a safe school predicated in article I, section 28, subdivision (c). That provision was enacted as part of "the Victim's Bill of Rights." It reads: `"Right to Safe Schools. All students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful.'" (Id. at p. 1454, 249 Cal. Rptr. 688.)
The Leger court confronted the issue of whether section 28, subdivision (c) provides for recovery of damages by its own terms. The court observed that "in the absence of express language to the contrary, every constitutional provision is selfexecuting in the sense that agencies of government are prohibited from taking official actions that contravene constitutional provisions. [Citation.] `Every constitutional provision is self-executing to this extent, that everything done in violation of it is void.' [Citations.]" (Leger, supra, 202 Cal.App.3d at p. 1454, 249 Cal.Rptr. *51 688.) The specific question raised by the plaintiff was whether section 28, subdivision (c) is "self executing" in the sense that it allows a private citizen to recover damages for violation of the provision in the absence of any enabling statute permitting that method of enforcement.
The Court of Appeal concluded that section 28, subdivision (c) was not self-executing in the sense that it supported a private claim for damages. "It [§ 28, subd. (c) ] imposes no express duty on anyone to make schools safe. It is wholly devoid of guidelines, mechanisms, or procedures from which a damages remedy could be inferred. Rather, `"it merely indicates principles, without laying down rules by means of which those principles may be given the force of law."' (Older v. Superior Court [ (1910) 157 Cal. 770, 775,] 780, 109 P. 478.)" (Leger, supra, 202 Cal. App.3d at p. 1455, 249 Cal.Rptr. 688; accord Clausing v. San Francisco Unified School Dist. (1990) 221 Cal.App.3d 1224, 1235-1238, 271 Cal.Rptr. 72.)
The court distinguished White v. Davis, supra, 13 Cal.3d 757, 120 Cal.Rptr. 94, 533 P.2d 222, and Porten v. University of San Francisco, supra, 64 Cal.App.3d 825, 134 Cal.Rptr. 839, on the ground that the election brochure published in connection with the enactment of the amendment adding "privacy" to article I, section 1 stated the amendment would create "`"a legal and enforceable right of privacy for every Californian."'" (Leger, supra, 202 Cal.App.3d at p. 1456, 249 Cal.Rptr. 688.) In other words, the constitutional right of privacy cases are predicated on the "legislative history" of the amendment declaring such right. More significantly, the Leger court distinguished Laguna Publishing by noting that it simply followed Melvin v. Reid, supra, 112 Cal.App. 285, 297 P. 91, "in allowing a cause of action for violation of free speech rights without regard to the self-executing nature of the constitutional provision." (Leger, supra, 202 Cal.App.3d at p. 1457, 249 Cal.Rptr. 688.)
In Gates v. Superior Court (1995) 32 Cal.App.4th 481, 38 Cal.Rptr.2d 489, the plaintiffs filed an action against the command officers of the Los Angeles Police Department for failing to provide protection against a riot which the department anticipated would occur following the conclusion of the Rodney King case. The crux of the claim was that the plaintiffs suffered personal injury damages because the department did not deploy officers to protect areas primarily inhabited by minorities. The defendants contended that they had immunity pursuant to Government Code section 845. The plaintiffs argued that the right to equal protection guaranteed by the article I, section 7, subdivision (a) overrode governmental immunity. The Gates court rejected that contention by applying an analysis that coincides with Justice Kaufman's dissent in Laguna Publishing and is supported by abundant decisional law.
"In construing the California Constitution we are required to effectuate the voters' intent. This is because the Constitution `"owes its whole force and authority to its ratification by the people. . . ."' [Citations.] The California Supreme Court has consistently required that the Constitution be interpreted so as to give effect to the voters' intentions. [Citations.] [¶] Applying this well-established rule of law articulated by the California Supreme Court, we conclude there is no evidence of any intent on the part of the voters to permit the recovery of personal injury damages as a result of a violation of the equal protection provisions of the California Constitution." (Gates, supra, 32 Cal.App.4th at p. 518, 38 Cal.Rptr.2d 489.)
In holding that the intent of the electorate is the controlling factor in determining if equal protection trumps governmental immunity and creates a self-executing constitutional right to recover damages, the Gates court focused on the cases involving the constitutional right of privacy and the constitutional right to damages for inverse condemnation. The court distinguished *52 White v. Davis, supra, 13 Cal.3d 757, 120 Cal.Rptr. 94, 533 P.2d 222, by reference to that court's reliance on the ballot argument that explained the 1972 amendment of article I, section 1. The court then traced the historical evolution of the constitutional right to recover damages for inverse condemnation by reference to the fact that the California Constitution, in all of its permutations, consistently provided for "just compensation" when a taking occurred.
The key point of the Gates analysis was its emphasis that the right to recover damages must be explicitly stated in the constitutional provision or be reasonably inferred from its "legislative history." On that basis, the court held that a violation of the constitutional right to equal protection is not a self-executing remedy to recover personal injury damages.
In Bonner v. City of Santa Ana (1996) 45 Cal.App.4th 1465, 53 Cal.Rptr.2d 671, the plaintiff was a homeless person who kept all of his property in a trash bag which he stored in some bushes near the city hall. A city worker took the bag and tossed it in the trash. The plaintiff then sued the city for damages on the grounds that the city defendants had denied him both equal protection of the law and due process of law as provided by article I, section 7. The plaintiff obtained a judgment for damages in the trial court. The city appealed, arguing that the violations of the constitutional provision for equal protection and due process of law are not self-executing and do not support an award of damages.
The Bonner court embraced the decision in Gates v. Superior Court, supra, 32 Cal. App.4th 481, 38 Cal.Rptr.2d 489. "The key issue in deciding whether a state constitutional provision may be enforced by way of an action for money damages is not whether its text may be stretched to make it `self-executing,' but whether the voters who ratified the provision intended it to be so enforceable. [Citation.] `The California Supreme Court has consistently required that the Constitution be interpreted so as to give effect to the voters' intentions. [Citations.]' (32 Cal.App.4th at p. 518, 38 Cal.Rptr.2d 489.) Thus, after canvassing the history of the state equal protection clause [citation], it was enough for the Gates court that there was nothing in the language or history of the clause to afford litigants a right to sue for money damages. The decision did not get bogged in the mysteries of self-execution." (Bonner, supra, 45 Cal.App.4th at p. 1472, 53 Cal.Rptr.2d 671, fns. omitted.)
The Bonner court, however, was compelled to address independently the plaintiffs claim predicated on due process. To that end, it examined the language and the intentions of the electorate who voted on the amendment which added the due process of law provision to the Constitution in 1974 as part of Proposition 7. The voter's pamphlet did not refer to any right to sue for money damages. It did, however, state: "`The proposition puts the following three rights into the State Constitution. These rights presently are contained in the Federal Constitution.' . . . (The other two rights were equal protection of the laws and the preclusion of an established religion.)" (Bonner, supra, 45 Cal.App.4th at p. 1474, 53 Cal.Rptr.2d 671.) Consequently, the Bonner court concluded "that in passing Proposition 7, the voters intended to put into the state Constitution what was already there in the federal [Constitution]." (Ibid.) However, because the United States Supreme Court had held that violation of the federal right of due process could, indeed, be enforced by an action for money damages, the Bonner court could not categorically say money damages were not recoverable for violation of state due process rights. In that context, and with respect to due process rights only, it was necessary to determine if the claimant had any remedies for the violation of that right other than a self-executing constitutional *53 claim for money damages.[7] The court easily identified an alternative remedy for plaintiff to pursue: the prosaic, but adequate cause of action for conversion. Accordingly, the Bonner court reversed the judgment based on the alleged violation of the plaintiffs due process rights.
In Carlsbad Aquafarm, Inc. v. Department of Health Services (2000) 83 Cal. App.4th 809, 100 Cal.Rptr.2d 87, the court reviewed a damage award based on an alleged violation of due process of law. (Art. I, § 7.) The court asserted that the determination of whether a constitutional right is a self-executing provision depends on the following factors: (1) the language of the provision; (2) the voters' intentions; (3) alternative remedies available; and (4) the importance of the particular constitutional right. (Id. at pp. 819-823, 100 Cal. Rptr.2d 87.)
The first two factors are consistent with the decisions in Leger, Gates, and Bonner, and Justice Kaufman's dissent in Laguna Publishing. The third factor, alternative remedies, is peculiarly applicable to due process rights as pointed out in Bonner, supra, 45 Cal.App.4th at pp. 1474-1475, 53 Cal.Rptr.2d 671.[8] And although alternate remedies are not necessarily applicable to the resolution of the issue here, Degrassi did have such a remedy. Essentially she complains the city defendants obstructed her ability to function as a member of the city council by denying her notice and access to meetings. Because the City of Glendora is not a charter city, the rights and responsibilities of its governing officers are set forth in Government Code sections 36501 through 36815. Consequently, Degrassi could have filed an original petition for writ of mandate pursuant to Code of Civil Procedure section 1085 to compel the city defendants to comply with these statutory duties so that she could exercise her lawful rights and duties as a public official. (See, e.g., State Board of Equalization v. Watson (1968) 68 Cal.2d 307, 66 Cal.Rptr. 377, 437 P.2d 761 [mandate lies to compel a county assessor to comply with statutory duty of making his records available for inspection] and Sego *54 v. Santa Monica Rent Control Bd. (1997) 57 Cal.App.4th 250, 67 Cal.Rptr.2d 68 [mandate lies to compel a rent control board to comply with its statutory duty of providing, upon request, a certificate of permissible rents].)
The fourth Carlsbad factor is the importance of the constitutional right at issue. The court concedes that it does not place great significance in "ranking" the different constitutional rights. Neither do we. A major flaw of the Laguna Publishing decision is that it elevated the "special dignity" accorded to the right of free speech to launch a tort claim for damages. By doing so, it transforms Melvin v. Reid, supra, 112 Cal.App. 285, 297 P. 91, into a constitutional free speech tort claim for damages. (Laguna Publishing, supra, 131 Cal.App.3d at pp. 852-853, 182 Cal.Rptr. 813.)
Carlsbad's most sharply focused observation is directed at the terms of a constitutional right. "A . . . factor traditionally relied upon by California courts in determining whether to permit a constitutional tort is the extent to which the constitutional provision is `self-executing.' While we agree with the authorities that this factor is difficult to apply, the `self-executing' analysis is helpful in the sense that it focuses a court's attention on the extent to which a constitutional provision includes `guidelines, mechanisms, or procedures from which a damages remedy could be inferred.' Where these express or implied guidelines are absent and permitting compensatory relief would be impractical, the constitutional provision may be inappropriate to support a damages remedy." (Carlsbad, supra, 83 Cal.App.4th at p. 822, 100 Cal.Rptr.2d 87, citations omitted.)
All of the post-Laguna Publishing decisions consistently determine if a constitutional right is self-executing by focusing on the meaning of its language and the express or implied intention of the electorate. We adopt that view.
In its present form, article I, section 2, subdivision (a) provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." The terms of this provision do not indicate or even suggest that a violation of this right implicates any recovery in monetary damages. In 1849, article I, section 9 was adopted.[9] Its content has remained essentially unchanged. In 1974, it was amended to include it as "section 2" and to delete the language pertaining to criminal libel. (See fn. 9, ante.) By its terms it does not include any "guidelines, mechanisms, or procedures from which a damages remedy could be inferred." (Leger, supra, 202 Cal.App.3d at p. 1455, 249 Cal.Rptr. 688.) Of equal significance is the fact that there is not any historical commentary or legal authority from which we could infer that the voters contemplated a violation of the constitutional right of free speech supports a private claim for damages. "In construing constitutional and statutory provisions, whether enacted by the Legislature or by initiative, the intent of the enacting body is the paramount consideration. [Citations.]" (In re Lance W. (1985) 37 Cal.3d 873, 889, 210 Cal.Rptr. 631, 694 P.2d 744.)
Accordingly, we hold that the state constitutional right of free speech as expressed in article I, section 2, is not selfexecuting and, if violated, does not support a claim for damages.[10]

*55 Conspiracy Claim
Degrassi's motion pursuant to Civil Code section 1714.10 for leave to file a conspiracy cause of action against the defendant law firm is without merit. It is predicated on the underlying claim that Degrassi's constitutional free speech rights may be addressed and remedied by a claim for damages. Because we have concluded that no such cause of action may be alleged, it follows that there cannot be a conspiracy predicated on that cause of action. (Okun v. Superior Court (1981) 29 Cal.3d 442, 454, 175 Cal.Rptr. 157, 629 P.2d 1369.)

DISPOSITION
The judgments are affirmed.
EPSTEIN, J, and CURRY, J., concur.
NOTES
[1] Appellant filed an action against respondents and the City of Glendora in the federal court to recover damages for violation of her civil rights under 42 United States Code section 1983 and for damages under the First Amendment of the United States Constitution. The federal court held her civil rights claim was time-barred and her claim for damages based on the federal Constitution was frivolous. (DeGrassi v. City of Glendora (9th Cir. 2000) 207 F.3d 636, 644-646, 647.) The disposition of appellant's claims in the federal action does not bar and is not dispositive of her claims in this court which are based on the state Constitution.

Hereinafter, all further article and section references are to the California Constitution unless otherwise indicated.
[2] There is no cause of action for punitive damages. (Grieves v. Superior Court (1984) 157 Cal.App.3d 159, 163-164, 203 Cal.Rptr. 556.)
[3] On July 6, 1999, the trial court sustained the general demurrer to the first cause of action for violation of appellant's claim of denial of her constitutional right of freedom of expression and overruled it as to the second cause of action for conspiracy to deprive her of that right. On July 29, 1999, the city defendants filed a petition for a writ of mandate in this court challenging the trial court's denial of the demurrer to the conspiracy cause of action. On August 5, 1999, we issued an alternative writ to the trial court directing it to vacate its order overruling the demurrer to the conspiracy cause of action or to show cause why a peremptory writ should not issue. On August 23, 1999, the trial court vacated its prior order and entered a new order sustaining the demurrer to the second cause of action without leave to amend.
[4] The specific language of Melvin v. Reid on which the Laguna Publishing court relied is: `Section 1 of article I of the Constitution of California provides as follows: "All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property; and pursuing and obtaining safety and happiness." [1] The right to pursue and obtain happiness is guaranteed to all by the fundamental law of our state. This right by its very nature includes the right to live free from the unwarranted attack of others upon one's liberty, property, and reputation. Any person living a life of rectitude has that right to happiness which includes a freedom from unnecessary attacks on his character, social standing or reputation. . . . We believe that the publication by respondents . . . was a direct invasion of her inalienable right guaranteed to her by our Constitution, to pursue and obtain happiness.'" (Id. at pp. 852-853, 182 Cal.Rptr. 813.)
[5] Civil Code section 1708 provides: "Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."

Civil Code section 3333 provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."
[6] Reflecting on the connection between Melvin v. Reid and the White and Porten decisions, the majority observed that Melvin v. Reid involved "an action which included a count for damages brought over 50 years ago under section 1 of article I of the California Constitution and based on allegations that a right of privacy had been illegally encroached upon. This, of course, was long before the 1973 [sic ] amendment construed by White, relied upon in Porten." (Laguna Publishing, supra, 131 Cal.App.3d at p. 852, 182 Cal.Rptr. 813.)
[7] "In Davis v. Passman (1979) 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 . . . . the United States Supreme Court held that violations of the federal due process could, indeed, be enforced by an action for money damages. . . . [U] But the Davis decision was explicitly predicated on the absence of alternative judicial relief. The case arose out of the discharge of an administrative assistant by a Congressmember because of her sex. She had no federal civil rights action because (at the time) Congress had exempted itself from the federal civil rights law. Because the Congress member was no longer serving, equitable relief was unavailable. The administrative assistant had no state cause of action. Other than the cause of action for money damages under the federal due process clause, nothing was available. For her, `"it [was] damages or nothing."'" (Bonner v. City of Santa Ana, supra, 45 Cal.App.4th at p. 1474, 53 Cal.Rptr.2d 671.)
[8] In Carlsbad Aquafarm, Inc. v. Department of Health Services, supra, 83 Cal.App.4th 809, 100 Cal.Rptr.2d 87, the court disagreed with the Bonner court. "It is not reasonable to infer from the single statement in the voter's pamphlet that the voters would have predicted the United States Supreme Court's extension of Bivens [v. Six Unknown Fed. Narcotics Agents (1971) 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619] to a procedural due process claim. Second, the language in the voter pamphlet relied upon by the Bonner court states only that Proposition 7 puts `rights' into the state Constitution that "`presently are contained in the Federal Constitution.'" [Citation.] This statement does not necessarily mean the voters would have understood they were adopting the analysis of the United States Supreme Court with respect to the existence of a damages remedy pertaining to those rights. Third, . . . Davis v. Passman was not a procedural due process claim as is presented here. . . . The Davis v. Passman holding, therefore, is closer to Gatesan equal protection casethan it is to Bonner and to this case, which raise procedural due process claims. [¶] Thus, we cannot accept Bonner's conclusion, based on the Proposition 7 ballot materials and the subsequently decided Davis v. Passman decision, that although California voters did not intend to create a damages remedy for a state equal protection violation, they must have intended to permit a damages claim for a state due process violation whenever a plaintiff has no `alternative' remedy." (Id. at p. 819, 100 Cal.Rptr.2d 87.)
[9] That provision read: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions on indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." (Art. I, § 9.)
[10] Defendants seek sanctions, claiming Degrassi's appeal is frivolous. Not so. The appeal has raised an important question of law. The request is therefore denied.